FREDERICKA HOMBERG WICKER, Judge.
|2Pefendant, Lloyd Munson, in his second appeal, appeals his convictions for one count of second degree murder, one count *9 of felon in possession of a firearm, and one count of obstruction of justice, violations of La. R.S. 14:80.1, La. R.S. 14:95.1, and La. R.S. 14:130.1 respectively. Defendant argues that the trial court erred both when it granted the State’s challenges for cause against particular jurors and when it refused to allow the jury to consider “guilty of accessory after the fact to second degree murder” as a responsive verdict to the charge of “obstruction of justice.” For the following reasons, we find defendant’s assignments of error without merit and affirm his conviction. Due to an error patent however, we remand this case for correction of defendant’s commitment.
| ¿FACTS AND PROCEDURAL HISTORY
On October 8, 2009, the Jefferson Parish grand jury indicted defendant, Lloyd A. Munson, for one count of second degree murder, one count of felon in possession of a firearm, and one count of obstruction of justice, violations of La. R.S. 14:80.1, La. R.S. 14:95.1, and La. R.S. 14:130.1 respectively. Defendant pled not guilty at arraignment.
Just before trial, defendant filed a motion seeking to add an “accessory after the fact to second degree murder” as a responsive verdict to the obstruction of justice charge. The trial court denied that motion. The following evidence was admitted at defendant’s trial in support of defendant’s convictions.
Ian Hughes testified that on the night the victim, Terrance Pinkley, was murdered, he and Pinkley spent time at a few area clubs and then had breakfast. After this, Hughes went home to his trailer on Providence Street. Pinkley told Hughes that he was “going I guess to do whatever he do at night. Either go home or possibly sell drugs I think.”
Inside his trailer, Hughes and his girlfriend, Latoya Dillard, fell sleep. Later, a noise coming from outside awoke Hughes. Hughes’ mother, who lived across the street in her own trailer, telephoned Hughes and told him “she heard someone trying to get in her shed in the back of her trailer.” Hughes walked outside to check on the noise but did not see anyone. He then walked to the “front of the street” and saw “a guy leaving out of the yard.” Mr. Hughes testified that, upon closer inspection, there were two other men by the “wooden shed across the street from where I live” and that one of the men had a gun. Hughes testified that as he was beginning to walk back inside his trailer, he saw a blue Jeep Grand Cherokee driving up the street. The Jeep backed into the empty lot by the wooden shed. Hughes heard the door and the hatch of the Jeep open. Approximately ten seconds |4later, he heard the doors close and the Jeep drive off. There were approximately four people in the Jeep. Hughes also testified that he asked the men what they were doing and they told him to mind his own business. Hughes testified that he then told his girlfriend to call 911 because “something didn’t look right.”
Shortly thereafter, Hughes received a telephone call. The caller stated that “he had my boy, he had kidnapped a friend of mine, and that he wanted $10,000 or something like that.” Hughes testified that he did not recognize the voice on the phone. Hughes thought the telephone call was a joke until the caller put Pinkley on the phone and Pinkley told Hughes “they not playing, they not playing. Come up with anything, whatever you can come up with.” Hughes testified that he told the caller that he would try to get what money he could, and the caller then hung up. At that point, the police arrived and Hughes attempted to explain the situation.
Hughes received several other calls from the same caller that night. During one of *10 the calls, the caller told Hughes “they was going to let me hear them, let me hear them shoot him.” The caller also made several more calls demanding money from Hughes. Hughes later used the telephone number obtained from his caller ID to return the phone calls. Hughes testified that the person who answered his call told him “don’t worry about it, don’t worry about it, that [Pinkley] was dead.” A subsequent call to Hughes informed him that Pinkley’s body could be located “on the other sides the tracks” by the “Cognac” club “near the graveyard on the side of an abandoned building.” Before hanging up, the caller warned Hughes, “next time you are going to know we are not playing. We gonna get your momma next time.” Hughes testified that Pinkley’s body was» later found where the caller said it would be.[1]
| BOIivia Smith also testified. She told the court that Pinkley was her grandson and that at 4:38 a.m. on the morning of March 1, 2008, she received a telephone call from Pinkley. In that call, Pinkley told her “[I] need plenty of money ... tell Uncle Alfred to raise up as much money as they can.” Pinkley did not however mention why he needed the money.
Detective Rodrigue, pursuant to an investigation of the above events, developed information that the telephone number which had been used to call Hughes was defendant’s cell phone number. Based on this information, Detective Rodrigue obtained an arrest warrant for defendant. Defendant was subsequently arrested and gave three statements; all of these statements were admitted at trial.
In his first statement, defendant stated that on the night in question, his brother, Leon Manuel, came to him in a blue Jeep Cherokee and asked him to take a ride. According to defendant, the purpose of the ride was to “go holler at Tee [Pinkley], to get the rest of the coke from him.” Defendant stated that he and Manuel were accompanied by defendant’s twin brother, Floyd Munson, Clarence Gould, and Jeremy Gould. Defendant further stated that Pinkley had previously sold the group low quality cocaine and that Pinkley was going to rectify the situation by giving them more cocaine. All five men were carrying firearms. Defendant admitted that he was carrying a black .45 caliber gun.
Apparently, when the group encountered Pinkley, he changed his mind and decided not to give them more cocaine. Defendant stated that Clarence Gould pointed his pistol at Pinkley and ordered him to get into the back of the Jeep. According to defendant, when the group arrived at Upland Street in Metairie, Clarence Gould escorted Pinkley out of the Jeep and shot him. At that point, Clarence and Leon Manuel dragged the victim’s body into an alley. Defendant admitted that he was present when Clarence Gould shot Pinkley but that it was not | Shis intention for Pinkley to be killed or kidnapped. Defendant further stated that he did not know that the other members of the group had any such intention.
In defendant’s second statement, he stated that on the morning after the murder, a girlfriend dropped him off at the Helena Street residence and that he later helped Leon Manuel burn the blue Jeep Grand Cherokee.
In defendant’s third statement, he admitted that he saw Clarence Gould shoot and kill Pinkley. Defendant continued to insist however that he did not know that *11 Clarence Gould was going to shoot Pink-ley.
Dr. Karen Ross also testified at defendant’s trial regarding the autopsy she conducted on Pinkley. Dr. Ross’ autopsy revealed two gunshot wounds to the back of his head, and a graze-type wound to the palm of his left hand. Dr. Ross also recovered a cellophane container from between Pinkley’s buttocks that contained cocaine. Dr. Ross testified that after conducting this autopsy, she determined Pinkley’s death was caused by gunshot wounds to his head, and that the manner of death was homicide.
In support of defendant’s conviction for felon in possession of a firearm, Aischa Prudhomme of the Jefferson Parish crime laboratory was certified as an expert in fingerprint identification. Ms. Prudhomme testified that defendant’s fingerprints taken prior to trial matched the fingerprints affixed to documentation establishing defendant’s prior 2004 conviction for possession of cocaine. This testimony was offered in addition to defendant’s admission in his first statement that he was carrying a gun when he went to meet Pinkley.
After the above and other evidence was introduced at defendant’s trial, a jury found defendant guilty as charged on all three counts. The trial court sentenced defendant for each of these convictions. Defendant thereafter sought his first appeal.
|7On November 15, 2011, without addressing the merits of defendant’s original appeal, this Court found that the trial court failed to rule on defendant’s pro se motions for post-verdict judgment of acquittal and motion for new trial. We therefore vacated defendant’s sentences and remanded the matter for rulings on the motions, reserving defendant’s right to appeal his convictions and sentences. State v. Munson, 11-54 (La.App. 5 Cir. 11/15/11), 78 So.3d 290.
On remand, the trial court denied defendant’s pro se motions for post-verdict judgment of acquittal and motion for new trial. After waiving delays, defendant was re-sentenced to a term of life imprisonment on the second degree murder conviction to be served without the benefit of parole, probation, or suspension of sentence; ten years at hard labor on the felon in possession of a firearm conviction to be served without the benefit of parole, probation or suspension of sentence; and forty years at hard labor on the obstruction of justice conviction. The trial court ordered all sentences to be served concurrently.
Defendant moved for an appeal. The trial court granted defendant’s motion for this, his second appeal.

DISCUSSION

Defendant assigns two errors of the trial court. First, defendant argues the trial court erred when it improperly granted the prosecution’s challenges to certain jurors for cause and thereby allowed the prosecution an illegally high number of peremptory challenges. Second, defendant argues the trial court erred in refusing to instruct the jury, and to allow the jury, to consider “guilty of accessory after the fact to second degree murder” as a responsive verdict to the charge of obstruction of justice. We address in turn, each of defendant’s assignments.

IsAssignment One

In his first assignment of error, defendant contends that the trial court erred by excusing four potential jurors, Gaynell Herbert, Emelie Buford, Mona DiGiovan-ni, and Larry Bright, from the jury pool following the State’s challenges for cause. Defendant maintains that as a result of this error the State was permitted a great *12 er'number of peremptory challenges than allowed by law.
Defendant was tried and convicted of second degree murder, a crime necessarily punishable at hard labor. La. R.S. 14:30.1. In trial for such a crime, La.C.Cr.P. art. 799 requires that, “each defendant shall have twelve peremptory challenges, and the State shall have twelve challenges for each defendant.” The erroneous allowance to the State of a challenge for cause does not afford the defendant a ground for complaint, unless the effect of such ruling is the exercise by the State of more peremptory challenges than it is entitled to by law. La.C.Cr. art. 800. Here, the State used eleven of its twelve peremptory challenges, excusing jurors Wilson, Haeuser, Simmons, Robinson, Tu, Noonan, McCoy, Daigre, Billiot, Zeagler, and Eugene. Therefore, to validly claim that the court made a reversible error, defendant must prove that the trial court erroneously excused two or more jurors for cause.
The Sixth Amendment to the United States Constitution guarantees the accused the right to a trial by an impartial jury. State v. Anderson, 06-2987 (La.9/9/08), 996 So.2d 973, 995, cert. denied, — U.S. -, 129 S.Ct. 1906, 173 L.Ed.2d 1057 (2009). Further, La. Const. Art. I, § 17 guarantees the right to full voir dire examination of prospective jurors and the right to challenge those jurors peremptorily. La. C.Cr.P. art. 797 sets forth the grounds for which a juror may be challenged for cause. Two of these grounds are pertinent here, namely, that “[t]he juror is not impartial, whatever the cause of his partiality,” and that “[t]he juror |flwill not accept the law as given to him by the court.” La.C.Cr.P. art. 797(2) and (4).
“[A] challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror’s responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied.” State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278, 1281, cert. denied, 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998), (quoting State v. Hallal, 557 So.2d 1388, 1389-90 (La.1990)). The trial judge must look at the juror’s responses during his entire testimony, not just “correct”, isolated answers, or, for that matter, “incorrect,” isolated answers. Id. (citing State v. Lee, 559 So.2d 1310, 1318 (La.1990), cert. denied, 499 U.S. 954, 111 S.Ct. 1431, 113 L.Ed.2d 482 (1991)). The trial judge is vested with broad discretion in ruling on challenges for cause; his ruling will be reversed only when a review of the entire voir dire reveals that the judge’s exercise of discretion was arbitrary and unreasonable with resultant prejudice to the accused. See State v. Labostrie, 358 So.2d 1243, 1247 (La.1978). This is necessarily so because the trial court has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questioning by the parties’ attorneys. State v. Lee, 93-2810, p. 9 (La.5/23/94), 637 So.2d 102, 108. Such expressions and intonations are not readily apparent at the appellate level where a review is based on a cold record. Id.
To determine whether the trial court committed reversible error by erroneously granting challenges for cause for two or more jurors, we will examine individually, each complained of challenge for cause granted to the State.
| inJuror Herbert
Defendant argues that the trial court erred in granting the State’s challenge for cause against Juror Herbert because of her expressed reluctance to convict based upon the uncorroborated testimony of one witness. Defendant further maintains that Ms. Herbert never stated that she would *13 not follow the law and that it is reasonable and wise for any juror to express a reluctance to convict based upon uncorroborated testimony of a lone witness.
In granting the State’s challenge to Ms. Herbert for cause, the trial court judge stated, “I’m convinced after listening to Ms. Herbert, no matter what the state proves in testimony alone, she thinks there is a high burden, higher burden, so I’m going to grant their motion for cause.” Defense counsel noted his objection without specifying his grounds.
In this appeal, defendant argues the trial court erred in two ways with regard to Ms. Herbert. First, defendant complains that Ms. Herbert was incorrectly challenged for cause based on responses she provided to improper hypothetical questioning.
“Louisiana law clearly establishes that a party interviewing a prospective juror may not ask a question or pose a hypothetical which would demand a commitment or pre-judgment from the juror or which would pry into the juror’s opinions about issues to be resolved in the case.” State v. Ball, 00-2277 (La.1/25/02), 824 So.2d 1089, 1110, cert. denied, 537 U.S. 864, 123 S.Ct. 260, 154 L.Ed.2d 107 (2002). Hypothetical questions and questions of law are not permitted in the examination of jurors which call for a pre-judgment of any supposed case on the facts. State v. Smith, 216 La. 1041, 45 So.2d 617, 618-19 (La.1950).
In the instant matter, the State set forth the law regarding convictions based on witness testimony alone. Through its line of questioning, the State sought to | ^evaluate the prospective jurors’ ability to apply the law regarding witness testimony in the absence of corroborating physical evidence, a relevant ássue to the case at bar. It did not seek to acquire any prejudgment conclusions concerning the facts of the case.[2] Under these facts, we find that the trial court did not improperly allow hypothetical questioning of Ms. Herbert.
Second, defendant complains that trial court erred in granting the State’s challenge for cause against Juror Herbert because she expressed reluctance to convict someone based upon uncorroborated witness testimony.
Under Louisiana law, a victim’s or witness’ testimony alone is usually sufficient to support the verdict. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’ testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Turner, 05-75, pp. 11-12 (La.App. 5 Cir. 5/31/05), 904 So.2d 816, 823, writ denied, 05-2591 (La.5/26/06), 930 So.2d 20.
In this case, Ms. Herbert indicated that she would not, or could not, accept this legal standard. Ms. Herbert also indicated that she would apply a different standard to murder cases as opposed to other cases. . She was told that the law allowed the State to prove its case through testimonial evidence alone in any criminal case, including a murder trial. However, Ms. Herbert indicated that in a murder trial, she would need physical evidence before “weighting] in on a murder.” She further expressed that she could convict on testimony alone on a “lesser” offense, but that she could not do so with respect to a murder case. Upon reviewing the voir dire in its entirety, the trial court stated that it was “convinced after listening to *14 Ms. Herbert, no matter what the state proves in testimony alone,” she would require a higher burden.
| ^Accordingly, we find that the trial court did not abuse its discretion in granting the State’s challenge for cause with regard to Juror Herbert.
Juror DiGiovanni
Juror DiGiovanni, like Ms. Herbert, expressed her reluctance to convict someone based upon the testimony of a single witness. The trial court granted the State’s challenge for cause as to Juror DiGiovanni. Defendant contends that Ms. DiGiovanni’s reluctance does not constitute grounds for a challenge for cause when she did not tell the court that she would not follow the law or would not decide the case according to the law and evidence.
Ms. DiGiovanni indicated uncertainty on being able to convict an individual on witness testimony alone. Her inability to follow the law was exhibited through her reluctant responses, e.g. “I’m not really sure,” “I just don’t think,” and “I would have a hard time.” This inability was apparent to the trial court after attempts at rehabilitation concerning her views failed. After scrutinizing the record as a whole, it appears Ms. DiGiovanni’s responses reflect a bias, prejudice, or inability to render a judgment according to the law. Thus, we find that the trial court did not abuse its discretion in granting the State’s challenge for cause as to Ms. Di-Giovanni.
Juror Buford
Next, defendant contests the State’s challenge for cause exercised against Juror Buford on the grounds that Ms. Buford stated that she might have a “tough time reaching a decision in this case.”
The trial court granted the State’s challenge for cause, noting, “I think her mind set is, and I was impressed "with her honesty and sincerity, and I personally get the impression she is not trying to dodge jury service, she is just trying to do |1sthe right thing by telling us she don’t [sic] think she can make up her mind on a case like this no matter what.”
It is apparent from the record that Ms. Buford’s responses to questions indicated that she was noncommittal and unable to make a decision. She also indicated that she could not ensure that she would be fair to the parties and that she would not make a good juror. Ms. Buford’s responses throughout voir dire demonstrated she did not understand and would have a difficult time following the law. Noting Juror Buford’s inability to “make up her mind on a case like this no matter what,” the trial court granted the State’s challenge for cause.
In Wyatt v. Hendrix, 43,559 (La.App. 2 Cir. 11/5/08), 998 So.2d 238, the court found no error in the trial court’s decision to grant a challenge for cause with regard to a juror who admitted that she was uncertain as to whether she could make a fair decision. As did the juror in Wyatt, Ms. Burford exhibited inability to render a decision in any case. Therefore, we find that the trial court did not abuse its discretion in granting the State’s challenge for cause as to this juror. '
Juror Bright
Lastly, defendant alleges that the challenge for cause exercised against Juror Bright was improperly based on Mr. Bright’s candid experiences with the police which would cause him to evaluate a police officer’s testimony with caution.
Although personal connections to and relationships with law enforcement personnel do not, by themselves, disqualify prospective jurors for cause, such associations and relationships are subject to care *15 ful scrutiny. Moreover, the Louisiana Supreme Court has held that a juror who will unquestioningly credit the testimony of law enforcement officers over that of defense witnesses is incompetent to serve. State v. Davenport, 445 So.2d 1190, 1193-94 (La.1984). The relevant question is whether a prospective juror could assess credibility of 114each witness independently of his relationship with law enforcement. If bias or prejudice may be reasonably attributed to a relationship or association, the prospective juror should be excused for cause. State v. Wilson, 25,775, 25,776 (La.App. 2 Cir. 2/23/94), 632 So.2d 861.
Several courts have held that when a potential juror harbors a bias against the police, that juror can be challenged for cause. For example, in State v. Divers, 38,524 (La.App. 2 Cir. 11/23/04), 889 So.2d 335, writ denied, 2004-3186 (La.4/8/05), 899 So.2d 2, cert. denied, 546 U.S. 939, 126 S.Ct. 431, 163 L.Ed.2d 327 (2005), it was revealed during voir dire that a witness possessed an anti-police bias because her brother had been incarcerated for armed robbery, a close friend had been incarcerated for homicide, and because she had been arrested twice. In that case, the trial court found the juror’s inability to follow the law and her bias towards the police supported granting the State’s challenge for cause. Id. On appeal, the Second Circuit affirmed, reasoning “[t]he trial court did not abuse its discretion in that [the juror] repeatedly indicated that she was not willing to follow the law and had a possible bias.” Id.
In this case, Mr. Bright indicated that he had been accused of crimes that he did not commit. He further indicated that he previously had bad experiences with police. When asked by the court if his prior experiences were going to “prejudice you no matter who testifies, what policeman testifies, you are not going to believe him no matter what,” Mr. Bright indicated “I think that might be the case.”
Based on the responses provided, it appears that Juror Bright possessed bias which would have prevented him from fairly considering the evidence. Despite attempts at rehabilitation, Juror Bright remained adamant about his inability to believe a police officer’s testimony due to his harbored personal bias towards law | ^enforcement. Because of this, we find that the trial court did not abuse its discretion in granting the State’s challenge for cause as to Mr. Bright.
Because we find the that trial court did not err in any of the four challenged grants to the State for their cause challenges, we find defendant’s first assignment to be without merit.

Assignment Two

In his second assignment, defendant argues the trial court erred in denying his motion to add “accessory after the fact to second degree murder” as a responsive verdict to his “obstruction of justice” charge and refusing to instruct the jury on this requested responsive verdict. In this motion, defendant argued that “obstruction of justice, under the circumstances of this case ... includes the crime of accessory after the fact.” Defendant is incorrect.
When a count in an indictment sets out an offense which includes other offenses of which the accused could be found guilty under the provisions of La. C.Cr.P. article 814 or 815, the court must charge the jury as to the law applicable to each offense. La.C.Cr.P. art. 803. Because La.C.Cr.P. art. 814 does not list any responsive verdicts for “obstruction of justice,” it is not applicable here. La.C.Cr.P. art. 815 however is applicable. It states in relevant part, “the following verdicts are responsive: (1) Guilty; (2) Guilty of a lesser and included grade of the offense *16 even though the offense charged is a felony, and the lesser offense a misdemeanor; or (3) Not Guilty.” La.C.Cr.P. art. 815 (emphasis added). Lesser and included offenses are those in which all of the essential elements of the lesser offense are also essential elements of the greater offense charged. State v. McCoy, 337 So.2d 192, 196 (La.1976). Therefore, if an offense’s essential elements are also elements of a charged offense, the court must instruct the jury as to the law applicable to that offense.
| ifiHere, the charge of accessory after the fact, defined by La. R.S. 14:25, is not a lesser included offense of obstruction of justice, defined by La. R.S. 14:130.1. After comparing La. R.S. 14:25 (defining “accessory after the fact”) and La. R.S. 14:130.1 (defining “obstruction of justice”), we find at least two elements required to convict a defendant for “accessory after the fact” that are not required to convict such a defendant for “obstruction of justice.” First, to convict a defendant as an “accessory after the fact,” the State must prove the defendant committed his act after an underlying felony occurred; this is not true to convict a defendant for “obstruction of justice.”[3] Second, to convict a defendant as “accessory after the fact” the State must prove the defendant took an act in order to aid a principal of a crime; again, this is not required to convict a defendant of “obstruction of justice.”[4] Because proving “accessory after the fact” requires proving these additional elements, “accessory after the fact” is not a lesser included crime of “obstruction of justice” nor a responsive verdict to it. Therefore, we find defendant’s second assignment to be without merit.

ERRORS PATENT REVIEW

This Court has reviewed the record in this appeal for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990), and found one such error requiring correction.
Defendant’s commitment entry contains a typographical error: it erroneously indicates that both count 1 and count 2 are for “(14:30.1 F II MURDER/SECOND DEGREE).” The transcript reflects however that Count 2 is not second degree 117murder, but rather possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1. When there is a discrepancy between the transcript and the commitment, the transcript generally prevails. State v. Richardson, 09-714, p. 8 (La.App. 5 Cir. 2/9/10), 33 So.3d 903, 908, writ denied, 10-0526 (La.10/15/10), 45 So.3d 1109 (citing State v. Lynch, 441 So.2d 732, 734 (La.1983)).
Accordingly, this Court remands this matter to the trial court and orders it to: amend the commitment for correction of the typographical error in conformity with the transcript; make an entry in the minutes reflecting this change; and direct the clerk of court to transmit the original of the minute entry to the officer in charge of the institution to which defendant has been *17 sentenced and to the General Counsel of the Louisiana Department of Public Safety and Corrections. La.C.Cr.P. art. 892(B)(2); State ex rel. Roland v. State, 06-0244 (La.9/15/06), 937 So.2d 846.

AFFIRMED IN PART, REMANDED IN PART

. Pinkley's body was found on the side of an abandoned house at 8301 Milan Street in Metairie, next to a cemetery. St. Charles Parish police found a stolen blue Jeep Grand Cherokee burned in St. Rose.

. Not only did defense counsel not object to this line of questioning, defense counsel himself used the same hypotheticals to question Ms. Herbert.

. La. R.S. 14:25 in pertinent part states, ‘‘[a]n accessory after the fact is any person who, after the commission of a felony, shall harbor, conceal, or aid the offender, knowing or having reasonable ground to believe that he has committed the felony, and with the intent that he may avoid or escape from arrest, trial, conviction, or punishment.” La. R.S. 14:25 (emphasis added).

. See e.g., State v. Plaisance, 01-1040 (La.App. 5 Cir. 3/26/02), 815 So.2d 272, where this Court found that La. R.S. 14:25 (accessory after the fact) criminalizes the act of aiding a fugitive rather than preparatory acts necessary to render the aid.